## No. 617.

### SARAH L. LAY ET AL. VS. SUCCESSION OF ELIAS O'NEIL.

The homologation of a tutor's accounts, even when had contradictorily with the under-tutor, is not conclusive on minors, who may, after majority, contest the accounts.

The citation of an heir, by the tutor, to oppose an account rendered by the tutor after the heir is of age, puts at issue *all* of the accounts rendered by the tutor while the heir was a minor, and the latter must then and there oppose all of those previous accounts, or be concluded by them.

Pending the existence of a civil war, any government that may arise capable of enforcing obedience, within certain territorial limits, is entitled to exact it, and no person, under the sway of such government, can be prejudiced in any manner for yielding it obedience.

A tutor who has done all, in the management of a minor's property, that a prudent administrator could do, can not be held for more than the revenues actually yielded by the property, and the actual proceeds of its sale.

APPEAL from the Parish Court of Bossier parish.   *Fort*, J.

*J. D. Watkins*, for plaintiffs and appellees.

*Land & Taylor* and J. A. *Snider*, for defendant.

The opinion of the court was delivered by

MANNING, C. J.   Isaac Lay died in Bossier parish in 1859, leaving an estate and several minor children. Elias O'Neill was appointed administrator of the succession, and satisfactorily closed his administration by final account, duly homologated August 4, 1860. He was then appointed tutor to the minors, and between that date and his death in

April 1871, he filed eight accounts of his tutorship. His widow is his executrix, and is defendant in this suit.

About six months after his death, the children of whom he had been tutor sued his succession to recover one hundred and thirty thousand dollars, due them for alleged maladministration. That suit was before the District court of Bossier parish, and on appeal in 1873, our predecessors dismissed it on a plea to the jurisdiction. Lay v. O'Neill, 25 Annual, 608.

They then instituted suit in the Parish court of Bossier for one hundred and four thousand dollars, in currency and about twenty-six thousand dollars in gold, and in 1875 on appeal, that suit was dismissed by sustaining an exception to the form of the action. 27 Annual, 643.

In the autumn of that year the present suit was commenced, alleging the tutorship, the maladministration, the rendition of eight accounts and the objections to them, the death of the tutor, the qualification of his widow as executrix, and praying that she be ordered to render an account to the plaintiffs of her testator's tutorship of them. The order was made, and she obeyed it.

The defendant, complying with this order, made the eighth annual accounts a part of her answer, and averred that the fifth of them included and recapitulated the balances embraced in the first four, and that it was homologated contradictorily with Elizabeth Lay, one of the plaintiffs, and her husband Joseph Robertson, as well as with the under tutor of the other heirs on 15th. of June 1866. After the rendition and homologation of the sixth and seventh accounts contradictorily with the under tutor, the same process was gone through with the eighth on Oct. 14, 1869, and contradictorily with Sara Lay and her husband, Boykin. The defendant pleads these judgments as *res adjudicata*, and that under art. 149 of the present constitution, they are conclusive against all parties to them upon all matters embraced in them, and finally pleads prescription to the action.

The plaintiffs, four in number, viz the two above mentioned, and Nancy, who became Mrs. Swann in October 1869, and Franklin, all opposed the account, and the matter now before us is the Account, rendered for O'Neal's tutorship, and the Opposition thereto. The various objections set forth in the opposition will appear as we proceed.

The first account of the tutorship was filed in May 1861, shewing a balance due the tutor of $6118.85. He gives the reason for this in his petition accompanying that account. "There was a large debt due the minor heirs of Benjamin Lay which was about to be sued on, and which had it been done, would have been ruinous to them, and knowing which and having money of his own and feeling great personal interest in the welfare of his wards, he advanced the money for the payment of the

same." The verity of this declaration is nowhere impugned. After citation to the under tutor, this account was homologated Aug. 3 1861.

The 2d account, after citation, was homologated March 7, 1863.

3d account was filed, and publication made thereof April 6 1864

4th account was filed and published April 29 1865

5th account was homologated June 15 1866

6th account was homologated June 6 1868

7th and 8th accounts were homologated Oct. 14 1869

No attempt appears to have been made to take any order on the 3d and 4th accounts, except for publication of the notice that they were filed, and no explanation of that omission is needed when the respective dates of their filing is observed. The 5th. account is a resumé of all that preceded it, and includes also the additional receipts and disbursements since the last, and shews a balance in favor of the minors of $5,347.63. By this time one of the heirs, Elizabeth, had married, and both herself and husband, as well as the under tutor to the other heirs, were cited personally. On July 12, 1867 this heir executed a receipt to O'Neill her former tutor in full of all moneys and balances due her on account of his administration as tutor, and her husband Robertson signed the receipt with her.

The 6th. 7th and 8th accounts are presented by O'Neill as the tutor of the three other heirs (Mrs. Robertson having no interest in the fund to be accounted for) and though the last two accounts were homologated on same day, the 7th. was filed and published June 16 1868, and the 8th. on Sept. 9 1869. Before this last date, Sara had become Mrs. Boykin, and she and her husband were cited personally as well as the under tutor of the remaining two minors.

After the 5th account had been homologated, the property was sold to effect a partition in December 1866, and on the 31st of that month, Mrs. Robertson received six thousand three hundred and seventy nine dollars and 62 cents in gold as her share of the proceeds of that sale.

Between March 5th. 1869 and March 21, 1871 Mrs. Boykin was paid seven thousand four hundred and fifty-four 48–100 dollars, which was in excess of the sum shewn to be due her. Separate accounts had been kept with each heir after the 5th.

Nancy or Addy Lay, as she is called in different parts of the pleadings had married W. M. Swann, and between Dec. 8 1867 and March 21, 1871 had received four thousand two hundred and forty five 95–100 in gold, and three thousand four hundred and fifty eight 07–100 in U. S. currency, and this is in excess of her share according to the account.

Franklin Lay had received two thousand and ninety nine 02–100 dollars after the filing of the 8th. account, which was nearly the balance due him as stated thereon. His share of the proceeds of the sale of Dec.

1866 is not included in this, nor commissions of tutor. A summarized statement in figures will be clearer than the recital.

### TUTOR IN ACCOUNT WITH FRANLKIN LAY.

| | | | |
|---|---|---|---|
| Dr. | To bal. due on 8th. account | | $2,377.65 |
| | " share of sale of 1866 | | 6,385.52 |
| | | | $8,763.17 |
| Cr. | By payments | $2,099.02 | |
| | " coms. thereon | 209.90 | |
| | " assets delivered to new tutor | 2,741.49 | $5,050.41 |
| | apparent sum due Franklin Lay | | $3,712.76 |
| | The sum overpaid Mrs. Boykin is | | $3721.07 |
| | and that overpaid Mrs. Swann is | | 444.89 |
| | | | $4,165.96 |

and as this is larger than the sum apparently due their brother, the counsel for the O'Neil succession ask us to deduct the one from the other, and thus relieve the tutor's estate.

The plea of prescription to the action of the Lay heirs is not good. It is argued that the 'action against the tutor respecting the acts of the tutorship' means technically a suit for an account, like the present, which was not instituted until more than four years after the two eldest had attained majority, and hence as to them it was prescribed. The suit first instituted was against the tutor, respecting the acts of the tutorship. It alleged an indebtedness resulting from his tutorship, and was such a demand as prevented the acquisition of prescription. It was followed by the second which renewed the demand. Service of process in these two suits brings the heirs within the time when they may have their action against their tutor.

The judgments, homologating the several annual accounts, are provisional merely, and do not conclude the minor, who has a certain time after the termination of his pupilage to object to them, even though his under tutor may have been cited and appeared for him. Stafford v. Villain, 10 La. 329. Bry v. Dowell, 1 Rob. 111. Succession of Tucker, 13 Annual, 464. But after the pupilage is terminated, and the heir is cited, he is bound to take notice of the account to which the citation refers, and of all others previously filed to which that is a pendant, and to object to it and oppose its homologation, under penalty of being concluded by the judgment. The plea of *res judicata*, opposed by the executrix in this case, so far as it is based upon the judgments upon the annual accounts after citation of the under tutor, can not be maintained. But

some of these accounts were final as to some of the heirs. As each one attained majority or married, and was cited, and settled with, the judgment thus rendered may not only be pleaded as the thing adjudged, but the settlement or payments made under the judgment may well be pleaded in bar of any future action. Yet more. It is questionable whether the heir can be permitted to file an opposition to the final account of his tutor, with whom he has settled the affairs of the tutorship, and to whom he has given a receipt and acquittance, before he has attacked the tutor by a direct action to annul his receipt. Haydel v. Poursel, 1 Annual, 38. Kellar v. O'Neal, 13 Annual 472.

The opponents repudiate the payments to each of them after the rendition of the accounts, and after each one, successively marrying, had been cited, and take shelter under art. 355 of the Code (art. 361 of the Revisal). which annuls agreements between tutors and pupils unless entered into after rendering a full account &c., which must be made to appear by the receipt of the pupil ten days previous thereto. It would be a reproach, if the Code furnished a shelter to those who seek to do an injustice by repudiating payments made to them in discharge of their tutor's liability. And that this article was not thus intended, has been long ago ruled by this court, even when the liability of the tutor was discharged, not by the payment of money, but by the delivery of property, its equivalent in value. Chapman's Case, 13 Annual, 228.

Great reliance is placed by the counsel for the tutor's succession on the effect of art. 149 of the constitution of 1868. They contend that under it, the judgments of homologation rendered between January 1861 and 1868 are valid and final, and they argue on the basis or theory, that judgments rendered during the late war between the States, in a locality that was under the sway and subject to the jurisdiction of the Confederate States, would not have been valid without 'an act of grace,' such as that Article of the present constitution.

This is not the theory that pervades the juridical history of the world. Every country that has suffered the calamity of intestine strife, and that has witnessed one portion of its subjects or citizens armed in hostile array to another, has acted upon the theory, that a government was entitled to obedience if it had the power to enforce it, and judicial tribunals have uniformly acted upon and applied this principle. As merely an abstract proposition it is so wise, and its application practically to human affairs has been found so salutary, that it is not to be supposed the framers of the constitution of 1868 were unmindful of its existence, or that they intended art. 149 to be more than a recognition of a rule that the experience of mankind, illumined by the gleam of centuries, has found necessary for its peace.

In the fifteenth century, and within so small a territorial area as Eng-

land, two hostile governments disputed with varying success for supremacy, and acquired or lost the possession of tracts of country with frequent alternations. During these wars of the Roses each government enforced the obedience of the inhabitants under its territorial sway, and they who rendered such obedience, whether it was enforced or voluntary, were not held to suffer for it. Blackstone thus exhibits the practical necessity for this doctrine, and its early recognition. " When therefore an usurper is in possession, the subject is excused and justified in obeying and giving him assistance: ∩therwise, under an usurpation, no man could be safe: if the lawful prince had a right to hang him for obedience to the powers in being, as the usurper would certainly do for disobedience." Comm. Book 4 marg. 78.

Nor are there wanting decisions of the highest court of our own country upon the extent of temporary sovereignty. In 1814 the port of Castine was captured by the British forces, and remained under their command and control until after the ratification of the treaty of peace. During this period, the British government exercised all civil and military authority over the place, and established a customhouse, and goods were imported under regulations prescribed by itself. Some of these remained at Castine until after it was evacuated by the enemy, and upon the reestablishment of the American government, the collector claimed a right to American duties on the goods. The court say—by the conquest and military occupation of Castine, the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty over the place. The sovereignty of the United States over the territory was of course suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors. By the surrender, the inhabitants passed under a temporary allegiance to the British government, and were bound by such laws, and such only, as it chose to recognise and impose. From the nature of the case, no other laws could be obligatory upon them, for where there is no protection, or allegiance, or sovereignty, there can be no claim to obedience. Castine was therefore during this period, so far as respected our revenue laws, to be deemed a foreign port, and goods imported into it by the inhabitants, were subject to such duties only as the British government chose to require. Such goods were, in no correct sense, imported into the United States. U. S. vs. Rice, 4 Wheaton 246.

The judgments of homologation of these accounts have the force and effect that any other judgment upon a like account rendered before 1861, would have and no more. The art. 149 does not impart to them the quality of finality and irrevocability, as supposed by the counsel for the

accountant, but they are governed by the same laws and the same adjudications that regulate all accounts of a tutor with his pupil.

Mrs. Robertson's receipts to her tutor after the fifth account, which was a final account as to her, and which was homologated after personal citation of herself and her husband, bind her, and discharge the tutor from any further claim of hers growing out of the tutorship. The judgment upon the eighth account, which was final as to Mrs. Boykin and Mrs. Swan, is equally conclusive as to their pretensions, and their over payment entails upon them the liability to refund.

We should not have to proceed further but that Franklin Lay did not attain majority until Nov. 3. 1874, after the death of his tutor O'Neil. The several accounts of his tutor are therefore open to his attack. The grounds alleged for opposition are elaborate and manifold. We shall be able to review only the most important, but have considered all.

The close of the war revealed an unprecedented situation. O'Neal had in charge the plantation of his wards, and had been so fortunate or so discreet that he had preserved their team, and implements of husbandry, and had corn and pork sufficient to last through the year. He convoked a family meeting to take advice, and it advised that he should hire laborers and work the plantation at the expense of the minors. O'Neill's special occupation or calling had been that of overseer. The family meeting recommended that O'Neill should live on the plantation, and give his personal attention to its cultivation, and should receive one fourth of the products for his services. He had suggested in his petition of convocation that the property should be leased, but it appears the relatives and friends of the minors who composed the council had great confidence in O'Neill's management, and desired to ensure his own personal services. O'Neill would not accede to their request. He could not control the labor necessary for successful planting. The freedmen were prejudiced against him, and were averse from entering into engagements with him. He leased the property to one Carter for the year 1866.

That year opened upon a people, who had been stunned and dazed by the sudden and sweeping subversion of their whole system of labor, but who by a reaction as sudden and complete, had become buoyant and jubilant over the rich reward that was in immediate prospect for the agriculturist. O'Neill took advantage of the opportunity. His contract with Carter was eminently advantageous to the minors. He stipulated that Carter was to furnish labor, and to pay for it, and they were to divide the gross crops equally.

It was a disastrous year. The floods came, and landlord and tenant and laborer were engulfed in a common ruin. The Lay plantation was almost an exception. There were two hundred and forty-five acres in the tract. The crop of 1866 was seventy-five bales of cotton and about

five hundred bushels of corn. O'Neill took half, and sold the cotton for gold, and paid it to the heirs. He was unwilling to try more experiments. The property was sold in December of that year under an order of court for partition, and the land realized twenty two thousand six hundred and fifty dollars in gold. We have seen that it was distributed equally.

The opponents charge that O'Neill was without authority in all this matter, and that he owes them twelve dollars per acre for the rent of their land for that year, and one dollar per bushel for six thousand bushels of corn, and something more for pork and use of implements, and eleven years of interest upon the whole. They have received the gold for the cotton raised during that year, and credit their tutor with it. Their demand is not just. O'Neill displayed extraordinary prudence and judgment in his management at this critical time, and did all that a 'prudent administrator' could do, and his wards profited by his good management.

Another item is an alleged sale of thirty bales of cotton in 1865 immediately after the close of the war, with the value of which the opponents seek to charge their tutor. O'Neill had credited them with the sale of exactly that number of bales in his 3d account, but they insist they were not sold then (1863) when of course Confederate currency alone could have been obtained, but that his entry on his account was a fraud, and the cotton was in fact retained until 1865, and then sold. O'Neill's account was prepared and filed in court during the war, and at a time when wiser men than he thought that all the cotton in the Confederacy ought to be burned, and stronger men than he, and of more authority, were burning it whenever occasion offered or pretext could be found. It could not have occurred to him to charge himself with the price of thirty bales of cotton in an account that was to go on the records, in the hope or expectation that he would save it, and sell it with profit at that indefinite time in the far future when a treaty of peace should be made between the then contending governments. His act in charging himself with the price of the cotton was unsuspicious both as to time and circumstance. Besides there is no evidence, either reliable or certain, to support the charge of appropriation of money or the charge of fraud. O'Neill's whole conduct as administrator of the property of these heirs falsifies the accusation. He did sell 114 bales of cotton on 12th August 1865 for nine thousand dollars, and 104 bales on March 10, 1866 for over fifteen thousand dollars, and he has accounted to the heirs for these sums.

Another ground of opposition is that the accounts for the years of the war were in Confederate currency, and that the charges made in them should be scaled, so as to reduce the amount charged against the minors

to their proper value in gold, and to facilitate us in doing this, we have been furnished with a tabulated statement of the value of Confederate currency at Richmond, expressed in gold, as extracted from Appleton's Cyclopædia. The counsel for the opponents does not rely on art. 127 of the constitution, which is inapplicable to the matters in issue here, nor upon the reported cases in this State immediately succeeding the war, which we do not regard as precedents, wherein a doctrine was maintained which the Supreme Court of the United States has since pronounced erroneous. Thorington v. Smith, 8 Wallace, 1.

In establishing liability, as between parties circumstanced as these were, a variety of considerations intervene. Prices not only nominally large but really so had to be paid for food and clothing of minors, while their own revenue was in the main cut off. The scarcity of food and clothing of itself caused an increase in price, so that the large prices paid then were not entirely due to the depreciation of the currency. A bottle of quinine, which cost one hundred and twenty dollars, is one of the items objected to. Of course the small value of the currency was one of the causes of this cost, but if the quinine at this moment in the State were instantly destroyed except a few bottles, the appreciation in price of those few bottles would be very considerable.

So again, the parish judge has stricken out of every one of these accounts of the war period, the excess of expenditures over receipts, on the general principle that a tutor cannot expend for a minor more than his revenues, which is quite true as a general rule. But he lost sight of the fact, that the reason why the revenues were so inconsiderable was, that the tutor was husbanding the cotton he was raising during these years, and saving it to produce a revenue on a grander scale thereafter. He sold some cotton during the war, as he was obliged to have some money, but he saved 218 bales and sold them for over twenty-four thousand dollars. Part of them were raised during these years when the revenues are inconsiderable, and equitably belong to those years. If he had sold the cotton each year as he raised it, the complaint would be that the minors' property was exchanged for valueless paper, but he would at least have got enough money to reimburse his expenditures. He preferred in the interests of the minors to wait, and they have been largely benefitted by his action.

This opinion would be extended much beyond its present length, were we to examine in detail the whole of the grounds of opposition. We do not think they are sufficient to entitle the opponents to a revision of the accounts. The three daughters of the deceased have no ground of complaint whatever. Elizabeth was paid in full, and Sara and Nancy were overpaid. We should give O'Neill's executrix a judgment against each of them for the sum overpaid if there were a prayer to that effect in the

MONROE, JULY, 1877. 731

Sarah L. Lay vs. Succession of O'Neil.

pleadings, but we find none except in the brief of counsel. We shall reserve the rights of O'Neill's succession in that respect.

We have already stated the *apparent* sum due Franklin Lay, but it is not certain that the tutor's succession is not entitled to a reduction of that sum, in so far as the commissions of the tutor are unpaid. The calculations point to a probable deduction of $1725.85, but we are not prepared so to adjudge, nor can we grant the prayer of the executrix to relieve the succession by crediting it with all that was paid to all the heirs indifferently, and thus decree the youngest to have been paid through his sisters. O'Neill was tutor to each one of the heirs. He should have paid to each only that which was her due. Having paid more to some than were their shares, he would be entitled to reimbursement from them of the overplus if he had asked it, but he must still pay to the youngest what is justly his, and to ascertain how much that is, the claim of Franklin Lay as set forth in this suit will not be concluded but must be ascertained, in accordance with the views expressed in this opinion upon the various matters discussed and decided therein.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court is avoided and reversed, and that there be judgment in favor of the executrix of Elias O'Neill's succession against Mary Elizabeth Robertson, and Sara L. Boykin, and Nancy A. Swann upon their demands, and that the right of the executrix of that succession to pursue the two last named for the sums overpaid to them is reserved. It is further ordered and decreed that there be judgment in favor of the executrix of Elias O'Neill against John Franklin Lay as in case of nonsuit, and that she, as executrix recover of the opponents the costs of both courts.